***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips. The appealing party has shown good grounds to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 *********** STIPULATIONS
1. On February 23, 1999, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the employee and defendant-employer.
3. The named employer is self-insured.
4. The date of injury is February 23, 1999.
5. The employee sustained a compensable injury to her cervical spine.
6. The employee's average weekly wage was $742.63, yielding a weekly compensation rate of $495.11.
7. The parties entered into a Form 21 Agreement for Compensation on or about April 24, 1999 for payment of compensation for temporary total disability beginning February 24, 1999 and continuing for "necessary" weeks. Plaintiff returned to work with defendants at the same or greater average weekly wage on April 4, 1999. She began receiving compensation for temporary partial disability on June 20, 1999 and continued to receive temporary partial disability compensation under N.C. Gen. Stat. § 97-30 through May 19, 2000. Plaintiff underwent surgery on May 23, 2000 for an ACDF with Blackstone plate and bone bank implantation at C5, 6, and 7. She received compensation for temporary total disability beginning May 20, 2000 through August 4, 2000. Temporary partial disability compensation recommenced August 5, 2000 and lasted through June 15, 2001. Plaintiff again began receiving temporary total disability compensation on June 16, 2001 and continued to receive temporary total disability compensation until November 22, 2002, when compensation was terminated by reason of a trial return to work. Temporary total disability compensation was recommenced on November 25, 2002 and has continued following plaintiff's submission of a Form 28U Request for reinstatement of compensation.
8. Plaintiff reached maximum medical improvement, according to one of her treating physicians, Ralph C. Loomis, MD, on May 23, 2001, a year after her surgery, with a permanent partial disability of 20% of the cervical spine.
 ***********
Based upon the credible evidence of record and reasonable inferences drawn therefrom, the Full Commission finds as fact the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was a 46 year old registered nurse.
2. Plaintiff began working for defendants in 1991 and held various nursing positions continuously since receiving her nursing degree in 1978.
3. The parties stipulated at the hearing before the Deputy Commissioner that the plaintiff sustained a compensable injury by accident to her cervical spine on February 23, 1999 and that the plaintiff was paid $495.11 per week in temporary total disability benefits beginning February 24, 1999 pursuant to a Form 21 Agreement for Compensation entered into on or about April 24, 1999.
4. Plaintiff returned to work for defendants on April 4, 1999 and began receiving temporary partial disability benefits from June 20, 1999 through May 19, 2000. Plaintiff underwent surgery on May 23, 2000 for an ACDF with Blackstone plate and bone bank implantation at C5, 6 and 7. She received compensation for temporary total disability beginning May 20, 2000 through August 4, 2000. Temporary partial disability compensation recommenced August 5, 2000 and lasted through June 15, 2001. Plaintiff again began receiving temporary total disability compensation until November 22, 2002, when compensation was terminated by reason of a trial return to work. Temporary total disability compensation was recommenced on November 25, 2002 and has continued following plaintiff's submission of a Form 28U Request for reinstatement of compensation.
5. Dr. Ralph Loomis, neurosurgeon, performed plaintiff's ACDF with Blackstone plates and bone bank implantation at C5, 6 and 7 on May 23, 2000. Following the surgery, the plaintiff returned to work for defendants on August 8, 2000 as a patient educator and care coordinator. However, on August 28, 2000 Dr. Loomis restricted plaintiff from performing the care coordinator duties and prohibited floor duty. Dr. Loomis restricted plaintiff to teaching only 6 hours a day.
6. On April 6, 2001, Dr. Loomis referred plaintiff to a hand specialist due to her severe posterior neck and bilateral arm pain. He also recommended a Functional Capacity Evaluation.
7. The Functional Capacity Evaluation was performed on May 16, 2001, which revealed plaintiff's significant limitations even at the sedentary physical demand. Dr. Loomis consequently opined that plaintiff was not employable on a full-time or part-time basis and he took plaintiff out of work permanently. On May 23, 2001 Dr. Loomis determined that plaintiff had reached maximum medical improvement and rated her with a 20% partial permanent disability of the spine.
8. Plaintiff presented to Dr. Davie Hankley, a physical medicine and rehabilitation specialist on October 10, 2001 complaining of continuing neck and left upper extremity pain and expressing concern regarding her decreasing functional status. Dr. Hankley noted that plaintiff sincerely wanted to try anything to become more functional to decrease her pain. Dr. Hankley recommended physical therapy.
9. Plaintiff's neck and arm pain continued and Dr. Hankley ordered another Functional Capacity Evaluation. During the Functional Capacity Evaluation on February 21, 2002, plaintiff stopped some of the tests due to pain, per the evaluator's (Robert Michael Piercy) instructions. Plaintiff was told to report any pain increase immediately and to stop the test. Mr. Piercy determined that plaintiff's lack of full physical effort was probably due to her fear of re-injuring herself.
10. After reviewing the Functional Capacity Evaluation results, Dr. Hankley determined that plaintiff had reached maximum medical improvement and could lift up to 10 pounds occasionally with weight lifting frequently. Dr. Hankley reviewed and approved the triage telephone nurse job.
11. On April 16, 2002 plaintiff was given another Functional Capacity Evaluation in which she exhibited maximum effort and the examiner, Huanne Jackson, opined plaintiff was below the sedentary physical demand of functioning and probably could not perform full-time work.
12. On November 22, 2002, plaintiff attempted a trial return to work as a telephone triage nurse with defendant. The plaintiff was excited about returning to work but after sitting 30 minutes, she began having muscle spasms in her neck. Plaintiff also began having left arm pain and had to leave work. On November 25, 2002, plaintiff again returned to work and her neck spasms returned after 30 minutes.
13. Dr. Loomis opined on November 25, 2002 that plaintiff had experienced left arm numbness and soreness and tightness in the back of her neck during her trial return to work. Dr. Loomis signed a Form 28U terminating plaintiff's trial return to work and referred the plaintiff to Dr. Margaret Burke.
14. On June 24, 2003 Dr. Loomis' partner, Dr. Margaret Burke, evaluated plaintiff as plaintiff continued to experience neck and left arm pain. Dr. Burke determined that plaintiff could not work 8 hours a day and recommended medication and pool therapy.
15. At the hearing before the Deputy Commissioner, plaintiff testified that her symptoms vary between less pain, when she can do errands to times when her left arm goes numb while driving. Plaintiff testified that she continues to experience neck spasms and shoulder spasms.
16. Mary Silver, defendant's Workers Compensation Administrator, testified at the hearing before the Deputy Commissioner that she does not expect plaintiff to be able to return to work on a full-time basis and she did not dispute plaintiff's inability to perform her job with defendant.
17. On October 7, 2003 Janice Ray, a clinical coordinator and plaintiff's supervisor for her trial return to work testified that 2 hours after returning to work for defendants on November 22, 2002 as a telephone triage nurse, plaintiff reported neck pain and that her arm was going numb. Ms. Ray testified that she could tell plaintiff was in pain because plaintiff grimaced. Also, Ms. Ray could see that plaintiff was in pain on November 25, 2002 as well, when plaintiff again tried to perform the job of telephone triage nurse.
18. On June 13, 2001 investigators with Advantage Surveillance, Inc. at defendant's request began videotaping plaintiff in situations where and when she could be observed in public. According to fourteen written reports from Advantage Surveillance, Inc. received in evidence, investigators attempted to videotape plaintiff on several dates throughout the summer and fall of 2001. Investigators again attempted to videotape plaintiff in March, May, June and November 2002. Over the course of 17 months, investigators were able to obtain film showing plaintiff in different activities on approximately 17 different days.
19. Prior to the hearing, based upon plaintiff's discovery request, five labeled surveillance videotapes were supplied to plaintiff's counsel. These same tapes were eventually entered into evidence at the hearing. Defense attorney submitted an index of the surveillance tapes at the hearing, however, neither the labels on the submitted tapes nor the index disclosed any surveillance on November 22, 2002.
20. On the morning of the August 27, 2003 hearing, plaintiff's attorney received an e-mail of approximately 60 pages of surveillance reports from Advantage Surveillance, based upon his request to defendants. These were not listed on the Pre-Trial Agreement. Plaintiff's counsel did not have sufficient time to review these reports prior to the hearing and compare them with the surveillance videotapes he had received, and was not aware of the surveillance taken on November 22, 2002.
21. On October 20, 2003, the plaintiff's counsel e-mailed defense counsel that he had reviewed the surveillance logs and noticed that it reflected that videotape was taken of surveillance on November 22, 2002, the date of the trial return to work, but that he had never seen this footage. Later that day, defense counsel delivered a videotape containing surveillance footage dated March 28, 2002, May 29, 2002, November 20, 2002 and December 29, 2002.
22. In his November 7, 2003 response to plaintiff's October 24, 2003 Motion, defense counsel stated, "that it was neither defendants nor its counsel's intention to mislead plaintiff or counsel of the existence of the November 22, 2002 tape."
23. Mary Silver contacted Advantage Surveillance to videotape plaintiff's November 22, 2002 trial return to work. This tape, which had not previously been disclosed, was admitted into evidence pursuant to an Order of the Commission on November 18, 2003. During Ms. Silver's deposition she testified that she decided to videotape plaintiff on her return to work date as she often does this to see whether or not the employees display signs and symptoms not normally seen on ordinary days when the employees were doing what they wanted to do.
24. Ms. Silver further testified that she did not mention that plaintiff was videotaped on the day of her trial return to work because she was never asked about specific dates.
25. The video surveillance tapes, with the exception of the surveillance taken on November 22, 2002, show that plaintiff was able to make occasional use of her left arm in a fairly normal fashion, although there was no evidence of lifting in excess of 10 pounds or repetitive use of the arm. The surveillance is consistent with plaintiff's testimony that she has good days and bad days, and is not inconsistent with work restrictions provided by her physicians.
26. The surveillance taken immediately after plaintiff's leaving defendant's office on November 22, 2002 shows plaintiff guarding her left arm at time code 10:56:22 a.m. and 11:11 a.m., crying in her vehicle for several minutes and stretching her neck back onto the headrest on several occasions at various times during the surveillance, and using her right arm to operate the locking control on the left arm rest in her car at time code 11:14 a.m. It is consistent with Mr. McGregor's February 25, 2003 report setting out plaintiff's increased discomfort during her trial return to work. It is also consistent with plaintiff's testimony that she had developed spasms in her neck and pain and numbness in her left arm at work, that she had to leave after about 2 ½ hours, that her pain was somewhat alleviated by resting with her head supported, tilted back, stretching the muscles and doing shoulder rolls, that she was crying because she was in pain, and was upset that she could not do the job that she had left and was wondering what was going to happen to her at that point.
27. Plaintiff's counsel deposed James Ruark of Advantage Surveillance on December 19, 2003. Mr. Ruark testified that the surveillance video of November 22, 2002, along with the surveillance report and bill was sent to Ms. Silver on or about November 25, 2002. He further testified that on September 2, 2003, Ms. Silver requested a tape of all surveillance. A tape containing the November 22, 2002 video among other dates was sent to Ms. Silver on or about that date. In her deposition, Ms. Silver testified that she received the November 22, 2002 videotape on or about November 25, 2002 and reviewed it. She then testified that she gave all the videotapes she received to defense attorney prior to the hearing.
28. Prior to defendants producing the November 22, 2002 surveillance video, defense counsel played surveillance footage from October 10, 2001, November 26 and 27, 2001 at Dr. Loomis' October 13, 2003 deposition. Dr. Loomis, notwithstanding his signing the Form 28U, had previously testified that based upon what he saw in the above-dated surveillance videos, plaintiff should have been able to perform the duties of triage nurse for defendant on November 22, 2002. However, when shown the November 22, 2002 surveillance videotape, Dr. Loomis testified that plaintiff's actions in the November 22, 2002 videotape were consistent with what she told him when she called on November 22 and November 25, 2002. He considered plaintiff's holding her arm to her body on two occasions, time coded at 10:56:22 a.m. and 11:11 a.m. to be "guarding", a protective mechanism to avoid aggravation of pain or injury and was consistent with a patient who was having pain or numbness in her left arm. He opined that plaintiff was experiencing increased neck and left-shoulder pain while attempting the job for defendant and that she was unable to perform the job on November 22, 2002.
29. After reviewing the November 22, 2002 video as well as surveillance from October 10, 2001, November 26, 27, 2001, Dr. Burke testified that plaintiff appeared to be in significant pain when she was coming out of defendant's office on November 22, 2002. Dr. Burke opined that plaintiff did not have adequate pain control and was not able to perform the job on that day.
30. Dr. Hankley did not treat plaintiff after March 2002 and there is no evidence he ever reviewed Dr. Loomis' or Dr. Burke's notes after plaintiff's trial return to work on November 22, 2002 and never saw the November 22, 2002 surveillance video. The Full Commission gives little weight to his opinion that plaintiff could perform the trial telephone triage nurse job.
31. John McGregor, a certified vocational evaluator and disability management specialist began working with plaintiff in August 2000 to assist plaintiff in a successful return to work. Mr. McGregor performed a vocational assessment of plaintiff and developed a rehabilitation plan. Mr. McGregor was familiar with plaintiff's medical history since her injury and accompanied her on some medical appointments.
32. Mr. McGregor testified that plaintiff was of impeccable character and he found her to be credible and that she worked diligently on her job search, making as many as 80 contacts between April 9, 2002 and May 10, 2002. At the hearing before the Deputy Commissioner, however, Mr. McGregor testified that he did not know why plaintiff could not continue to perform the job for defendants notwithstanding his February 25, 2003 progress report detailing plaintiff's neck pain and arm numbness while sitting at a desk during her trial return to work. However, Mr. McGregor had not reviewed the November 22, 2002 return to work video. The Full Commission gives little weight to Mr. McGregor's opinion regarding plaintiff's ability to perform defendants job.
33. The Full Commission gives greater weight to the opinions of Drs. Loomis and Burke who treated the plaintiff extensively and reviewed the November 22, 2002 surveillance videotape.
34. The competent evidence in the record establishes that plaintiff attempted a trial return to work on November 22, 2002 with defendants at the only job she was able to obtain, but was unable to perform the job and was taken out of work by an authorized physician.
35. Plaintiff's presumption of disability continues, as there is insufficient evidence in the record to prove by the greater weight that plaintiff is capable of earning her pre-injury wages in the same or any other employment.
36. The competent evidence in the record fails to establish that plaintiff failed to cooperate with recommendations from Mr. McGregor.
37. The Full Commission finds the defendants knew about the November 22, 2002 surveillance videotape and failed to make it available to the plaintiff and her attorney in a timely manner even upon proper request from the plaintiff. The Full Commission finds the defendants acted in bad faith when they failed to timely disclose the existence of the November 22, 2002 surveillance videotape and timely make it available per plaintiff's request.
38. The defendants unreasonably defended this matter based on stubborn, unfounded litigiousness entitling plaintiff to attorney fees.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On February 23, 1999, plaintiff sustained an injury by accident arising out of and in the course and scope of her employment as a direct result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. The Form 21 Agreement for Compensation, approved by the Industrial Commission, created a rebuttable presumption of continuing disability in plaintiff's favor. N.C. Gen. Stat. § 97-29; Watkins v. Central MotorLines, Inc., 279 N.C. 132, 181 S.E.2d 588 (1971); Radica v. CarolinaMills, 113 N.C. App. 440, 439 S.E.2d 185 (1994); Franklin v. BroyhillFurniture, 123 N.C. App. 200, 472 S.E.2d 382 (1996) Kisiah v. W.R.Kisiah Plumbing, Inc., 124 N.C. 72, 476 S.E.2d 434 (1996); disc. reviewdenied, 345 N.C. 343, 483 S.E.2d 169 (1997).
3. Defendants have not presented evidence sufficient to rebut the presumption of continued disability raised by the approved Form 21 Agreement. Plaintiff is therefore entitled to a continuing presumption of disability.
4. The plaintiff is entitled to temporary total disability benefits at the rate of $495.11 per week beginning June 16, 2001 through November 22, 2002 and beginning again November 25, 2002 and continuing until further order of the Commission. Compensation accrued shall be paid in a lump sum. N.C. Gen. Stat. § 97-29.
5. As a result of plaintiff's February 23, 1999 admittedly compensable injury by accident, she is entitled to have defendants pay for all related medical expenses incurred, or to be incurred, by plaintiff for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25; 97-2(19).
6. The plaintiff is ordered to comply with vocational rehabilitation. Mr. McGregor shall continue on this case and shall review the November 22, 2002 video surveillance tape of plaintiff. Should concerted efforts between plaintiff and Mr. McGregor fail, the parties shall attempt to agree upon a successor vocational specialist. If the parties fail to agree, the North Carolina Industrial Commission Nurses Section shall be contacted to assist the parties in selecting a successor.
7. Plaintiff is entitled to have defendants pay her reasonable attorney's fees for bringing this claim as a sanction due to their bad faith in failing to timely disclose the November 22, 2002 surveillance videotape. N.C. Gen. Stat. § 97-88.1, Commission Rule 802.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney fee herein approved, defendants shall pay to plaintiff temporary total disability compensation at the rate of $495.11 per week beginning June 16, 2001 through November 22, 2002 and beginning again November 25, 2002 and continuing until further order of the Commission. Compensation due that has accrued shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of her compensable injury on February 23, 1999, for so long as such examinations, evaluations and treatment may be reasonably necessary to affect a cure, give relief or lessen plaintiff's period of disability.
3. The plaintiff is ordered to comply with vocational rehabilitation. Mr. McGregor shall continue on this case and shall review the November 22, 2002 video surveillance tape of plaintiff. Should concerted efforts between plaintiff and Mr. McGregor fail, the parties shall attempt to agree upon a successor vocational specialist. If the parties fail to agree, the North Carolina Industrial Commission Nurses Section shall be contacted to assist the parties in selecting a successor.
4. A reasonable attorney's fee of twenty-five percent (25%) of the lump sum compensation due plaintiff in Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be deducted from those amounts and payable directly to plaintiff's counsel. Thereafter, plaintiff's counsel is awarded a reasonable fee of 25% of the ongoing temporary total disability compensation which shall be paid in addition to and not deducted from the amounts due plaintiff.
5. Defendants shall also be liable for an additional $5,000.00 sanction pursuant to Rule 802 and payable to the North Carolina Industrial Commission for failing to timely disclose the November 22, 2002 surveillance videotape.
6. Defendants shall pay the costs.
This the ___ day of January 2005.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN
PTY:db